# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| RANDY BOWMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No.: 7:15-cv-01318-JHE |
| ) | |
| HODGE MANAGEMENT GROUP, LLC, et ) | |
| al., ) | |
| ) | |
| Defendants. | |

## MEMORANDUM OPINION[1] AND ORDER

On October 24 2016, Plaintiffs Randy Bowman ("Bowman") and Skyland Aviation, Inc. ("Skyland") (collectively, "Plaintiffs") filed an amended complaint asserting the following claims against Defendants Hodge Management Group, LLC ("Hodge Mgmt."), Jerry Hodge ("Hodge"), Bank of America, N.A. ("BOA"), Air Bear, Inc. ("Air Bear"), Bryan Danial ("Daniel") and Banc of America Leasing & Capital, LLC ("BALCAP") (collectively, "Defendants): (1) quantum meruit/implied contract, (2) unjust enrichment, (3) fraudulent misrepresentation/suppression, (4) breach of warranty of authority, (5) intentional interference with business relations, (6) conspiracy. (Doc. 28). Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. (Doc. 39). Additionally, Bowman moves pursuant Rule 56, for an order granting partial summary judgment in his favor as to Defendants Hodge and Air Bear's lability on Count 1 for quantum meruit/implied contract. (Doc. 42). The motions are fully briefed and ripe for review.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 7).

1

(Docs. 39-43, 47-50). As explained more fully below, Bowman's motion for summary judgment (doc 42) is **DENIED**; Defendants' motion for summary judgment (doc. 39) is **GRANTED IN PART AND DENIED IN PART**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).

However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted).

## II. Summary Judgment Facts

### A. Air Bear, Inc.'s Corporate Structure

Air Bear, Inc. ("Air Bear") is a corporation whose purpose is to own airplanes. (Doc. 43-1 at 23 (85:13-15)). Air Bear is part of a series of companies owned and/or controlled by Jerry Hodge, including Hodge Management Group, LLC that hires employees and Jerry Hodge Investment, LLC that leases the airplanes. (*Id.* (86:3-7)). Hodge also owns Air Bear and serves as Chairman of its Board of Directors. (*id.* (85:8-8, 88:16-18)). Hodge is Air Bear's President and has authority to sign contracts on its behalf. (*Id.*at 13, 22 (47:10-14, 82:15-16)).

Bryan Daniel is Air Bear's Chief Pilot and has been since approximately April 2014. (Doc. 43-1 at 12 (41:9-17)). Daniel's duties included, among other things, piloting Air Bear's airplanes and overseeing their maintenance, scheduling, and cleaning. (Doc. 41-5 at 13 (46:5-14)). Daniel

3

occasionally receives correspondence addressed to Air Bear. (Doc. 41-3 at 35 (133:15-22)). Further, Daniel is involved in Air Bear's purchases and sales of aircrafts – specifically the gathering of information. (Doc. 41-5 at 13-14 (47:4-6; 48:2-6; 48:20-49:20)). For example, when Air Bear wants to purchase or sell an aircraft, Hodge and Daniel discuss the aircraft's price, condition, and maintenance. (*Id.* at 14 (50:12-17)). Daniel also communicates with brokers representing aircrafts that Air Bear may want to purchase or sell, (*id.* at 14, 16 (50:18-22; 51:8-12; 57:14-58:6)), and occasionally provides Hodge with aircraft listings and similar information he (Daniel) believes Air Bear should see or may be interested in, (doc. 41-3 at 10-11, 13 (36:15-37-6; 39:19-21; 40:10-15; 40:16-41:2; 45:13-19)). Hodge is "ultimately in charge" of Air Bear's aircraft transactions and oversees Daniel's performance as Chief Pilot. (Doc. 41-3 at 17, 20. 33-34 (62:1-4; 75:11-13; 127:22-128:1; 128:18-129:11).

### B. Air Bear, Inc.'s Introduction to Randy Bowman

Randy Bowman ("Bowman") has worked in the aircraft sales industry for over thirty years. (Doc. 41-4 at 8 (27:21-28:10)). During that time, Bowman has been involved in approximately seventy transactions for both buyers and sellers. (*Id.* at 9 (32:1-6)). Early in his career as a paid employee of Jet East, Bowman would flip airplanes for a profit and get paid a percentage from the gross of the sale. (Doc. 41-4 at 9 (31:1-32:6)). Bowman did this about sixty times during his career. (*Id.*). Of those sixty transactions, Bowman was never paid for helping his employer purchase an aircraft. (*Id.* at 10 (34:1-4)). Outside of acting as a retained employee, Bowman has only acted as a broker for two other transactions: the King Air, discussed below, and a citation Bravo. (Doc. 41-4 at 14 (49:21-50:6)). For the Citation, he had an acquisition agreement with his client that entitled him to a $35,000.00 commission if the plane sold. (*Id.* at 16 (58:9-59:13)). Prior to the King Air transactions, Bowman had not been involved in any aircraft deals since 2005. (*Id.*

4

at 25 (96:4-9)). At his deposition, Bowman was unable to identify a specific time where he acted as a buyer's broker and was paid a percentage of the sale price as his commission. (Doc. 41-4 at 38 (148:2-9)).

In 2012, Bowman assisted in an aircraft purchase transaction involving Hodge, Daniel, and Air Bear. (Doc. 41-5 at 6 (18:3-16)). Specifically, Bowman assisted Express Jets, the broker who represented the seller of a King Air C-90 (the "King Air") that Air Bear purchased on or about November 5, 2012. (Doc. 41-5 at 8-9 (28:12-29:11); doc. 41-4 at 14-15 (52:22-53:19)). Daniel testified that since Bowman sold Air Bear the King Air in 2012, he (Daniel) understood Bowman is an aircraft broker. (Doc. 41-3 at 6 (17:3-10)).

As it to relates to this transaction, around the end of the summer of 2012, Daniel was instructed to inquire about Air Bear purchasing the King Air. (Doc. 41-3 at 15 (18-23)). Thereafter, Daniel contacted Bowman about Air Bear purchasing the King Air and (at Hodge's request) relayed Hodge's belief that the aircraft was overpriced. (*Id.* at 15-16 (55:22-56:19; 56:23-57:2)). During this time, Daniel forwarded Hodge information and communications he received from Bowman. (*See* doc. 31-1 at 184-187). Bowman is referred to as a "broker" in at least one of these communications with Hodge. (*See id.*; doc. 41-3 at 15 (53:9-14)). Although Hodge did not remember sending the Letter of Intent to Bowman (because he likely gave it to his in-house counsel to handle), Hodge testified he should have known Bowman's role in the King Air purchase. (Doc. 41-5 at 9 (29:4-23)).

As part of Air Bear's purchase of the King Air, Daniel and Hodge received a document titled "Seller's Disbursement Instruction's" that specifies $ 30,000.00 is to be paid to Express Jets (the seller's broker). (Doc. 41-3 at 189; doc. 41-4 at 19 (70:22-71:9)). Bowman, working for Express Jets, was paid a commission (part of the $ 30,000.00) resulting from Air Bear's purchase

5

of the King Air. (Doc. 41-4 at 15 (53:20-54:5)). Daniel knew this, and Hodge assumed the individual working for Express Jets would be paid a commission. (Doc. 41-3 at 19: (69:10-19; 70:2-8); doc. 41-5 at 6, 9 (19:1-23; 31:21-32:1)). Daniel also testified that it is typical for a broker representing a seller or buyer to receive a commission. (Doc. 43-1 at 22 (82:16-84:8)). Although Daniel and Bowman discussed numerous aspects of the King Air transaction, Air Bear never paid a commission to Bowman for the purchase of the King Air. (Doc. 41-5 at 6 (19:1-7)). Bowman's commission for the King Air was entirely as a seller's broker and paid entirely by Bull Mountain Aviation, the seller. (Doc. 41-4 at 27-28 (104:10-105:3)).

After Air Bear purchased the King Air, Bowman and Daniel maintained a friendly, professional relationship to discuss the aircraft market and the future needs of Hodge and Air Bear. (Doc. 41-4 at 22 (83:16-23; 84:1-11); doc. 43-1 at 38 (147:4-148:3)). When Bowman asked, Daniel told Bowman it was acceptable for him to forward information about aircrafts listed for sale, which Bowman did on multiple occasions. (Doc. 41-3 at 40 (154:9-17); *see e.g.*, doc. 41-3 at 203-210). Daniel occasionally requested follow-up information from Bowman about these aircrafts, (doc. 41-3 at 40-41 (156:12-157:12; 159:16-19), and Bowman generally responded to Daniel's request for information, (doc. *id.* at 42 (162:11-14)).

### C. The BOA Challenger 300

Hodge became interested in purchasing a Bombardier Challenger 300 when he toured one his friend owned. (Doc. 41-5 at 18 (67:1-68:6)). Hodge liked the aircraft's headroom, spacious bathrooms, and flight range. (*Id.* (68:7-19)). Hodge told Daniel to send him information regarding

Challenger 300s for sale.² (*Id.* (67:7-11)).

In June 2014, BALCAP owned and marketed for sale a private business jet aircraft known as a Bombardier Challenger 300, serial number 20121 (the "BOA Challenger 300" or "Aircraft"). (Doc. 41-1 at 2). To market the Aircraft, BALCAP retained Leading Edge Aviation Solutions ("LEAS") as its exclusive agent. (*Id;* doc. 41-2 at 27-30).

On December 1, 2014, Bowman emailed Daniel listing information for the BOA Challenger 300. (Doc. 41-3 at 214-221). At the time, Air Bear was not looking for a larger aircraft. (*Id.* at 44 (169:4-18)). Bowman's email was the first time Air Bear, Hodge, and Daniel learned of the Challenger 300. (*Id.* at 43-44 (168:22—169:3)). Daniel forwarded Bowman's email regarding the BOA Challenger 300 to Hodge and stated that the "broker on our king air sends me these deals on planes that he thinks are steals every now and again." (Doc. 41-3 at 222).

In addition to the listing for the BOA Challenger 300, Bowman sent Daniel three other listings for Challenger 300s. (Doc. 41-3 at 36 (138:16-139:23)). Two of the three other listings could be considered "comparables." (*Id.* at 36-37 (139:4-141:3)). The third listing was not considered a comparable because of its high total flight hours, but nevertheless provided some evidence of the Challenger 300 market. (*Id.* at 36-37 (140:1-141:1)).

Daniel requested additional information regarding some of the Challenger 300 listings Bowman provided, including:

- o On January 14, 2015, Bowman emailed Daniel a listing for a 2004 Challenger 300 (i.e., the

---

² Bowman points out that Daniel admitted that Bowman acted as a liaison for Air Bear regarding its purchase of the BOA Challenger 300, which Daniel defined as "someone who relays information, but does more than relay information, they also provide input as to that information." (Doc. 42 at 9, ¶ 22; doc. 41-3 at 87-88 (346:7-20; 347:7-16)). However, Daniel also testified he did not have any authority "to be doing any of it." (Doc. 41-3 at 88 (347:3-6)).

7

o one that was not a comparable). (Doc. 41-3 at 223). In an emailed response, Daniel asked if the aircraft had damage history and why it was so cheap. (*Id.*). Bowman explained, via email, that there was no known damage, but that it had an earlier serial number. (*Id.*).

o On March 16, 2015, Daniel responded to an email from Bowman and requested Bowman "[s]end [him] the 300 stuff again." (Doc. 41-3 at 232). Bowman responded, "will do" and sent Daniel the information he requested. (*Id.*; doc. 41-3 at 49 (190:15-191:2)).

o On March 21, 2015, Daniel asked Bowman via email for the price of a certain Challenger 300, and Bowman responded. (Doc. 41-3 at 233).

o On March 26, 2015, Daniel sent a text message to Bowman requesting an aircraft valuation for the BOA Challenger 300. (Doc. 41-3 at 238-41). The next day, Bowman emailed Daniel the aircraft evaluation. (*Id.* at 235-237).

o On March 31, 2015, Daniel sent Bowman a text message requesting the MSP rates (i.e., rates for an engine insurance program) regarding the BOA Challenger 300. (Doc. 41-3 at 256-257).

o On April 6, 2015, Daniel sent Bowman a text message asking for the price and year of a certain Challenger 300 and whether it was on Controller. (Doc. 41-3 at 283).

Bowman also helped coordinate two demonstration flights of the BOA Challenger 300. (Doc. 41-3 at 37 (141:10-142:6)). As related to these demonstration flights, Daniel requested the following from Bowman:

o On March 31, 2015, Daniel sent a text message to Bowman, asking to change the itinerary for one of the demonstration flights. (Doc. 41-3 at 256-257).

o Around April 2, 2015, Daniel sent a text message to Bowman requesting Bowman change the fueling plan for one of the demonstration flights. (Doc. 41-3 at 271-272).

8

- On April 2, 2015, Daniel sent Bowman a text message asking him to provide an updated invoice for one of the demonstration flights. (*Id.*).

- Around April 6, 2016, Daniel sent Bowman a text message asking whether there was "any word," referring to whether he had obtained a refund from Bank of America related to one of the demonstration flights. (Doc. 41-3 at 283; doc. 41-3 at 83 (326:4-327:10)).

Additionally. Bowman provided his opinion regarding the BOA Challenger 300 being a "better buy" for Air Bear, (doc. 41-3 at 46 (177:10-178:3)), and Bowman obtained an informal quote for either a demonstration flight or a showing of another Challenger 300, (*id.* at 92 (364:2-12)).

Since around December 2, 2014, Hodge knew Daniel was communicating with Bowman regarding the BOA Challenger 300, as Hodge was copied on some of the emails between Daniel and Bowman. (Doc. 41-5 at 10-11 (34:15-18; 35:8-10; 38:14-20)).

### D. Bowman's Contacts with LEAS

In April 2015, Bowman contacted LEAS and represented himself to be the broker for Air Bear. (Doc. 41-1 at 2). Believing Bowman to be a legitimate representative with an agreement to represent Air Bear, LEAS informed BALCAP Vice-President Matt Dyer of the prospective purchaser. (Doc. 41-1 at 2).

Attempting to arrange a demonstration of the Aircraft, Dyer reached out to Bowman to obtain information about Air Bear. (Doc. 41-1 at 3). After some difficulty getting information from Bowman, Dyer called and left a voicemail for Air Bear's chief pilot, Bryan Danial. (*Id.*). Shortly after leaving the voicemail, Dyer received the following email from his broker, Rick Richardson of LEAS:

> Matt, please don't call Bryan [Daniel]. He called Randy [Bowman] and said he wanted to run all communications through him.

9

(*Id.*; doc. 41-2 at 9 (31:7-32:3)). Thus, Bowman unilaterally directed all communication to go through him, and he told Richardson that Daniel did not want anyone contacting him. (Doc. 41-2 at 9 (31:7-32:3)). Bowman also later contacted Dyer and falsely told him that Daniel was "extremely upset that [he] had reached out to him directly." (Doc. 41-1 at 3).

Daniel returned Dyer's call two days later, and Dyer told Daniel he was surprised to hear from him given the message from Bowman that he was not to have any contact with Daniel. (Doc. 41-1 at 3). According to Daniel, he corrected the statement from Bowman and told Dyer that Bowman was not Air Bear's agent and that Air Bear had no acquisition agreement with Bowman. (*Id.*; doc. 41-3 at 100, 103 (395:19-396:9, 407:19-22)). Contrary to Bowman's representation to Dyer, Daniel testified he never told Bowman that it made him uncomfortable for Dyer to call him. (Doc. 41-3 at 95 (373:22-374:3)). Bowman disputes this, testifying that Daniel "contacted me and was not happy that [Dyer] had contacted him[.]" (Doc. 41-4 at 45 (175:19-176:1)).

Bowman testifies he understands the purpose of having a written agreement, (doc. 41-4 at 32 (121:5-15)), and that there was no express agreement to pay a 2.5% broker's commission, (*id.* at 31 (118:1-4)). Nevertheless, Bowman told BALCAP and LEAS he "represented" Air Bear, explaining he did this based on Daniel's "continued request for information on the aircraft, his ongoing requests and discussions of the aircraft." (*Id.* (117:15-118:15)). Specifically, Bowman testifies he told BALCAP and LEAS as follows:

> I said, I have a client that I have sold an aircraft to in the past that has contacted me about your aircraft and, therefore, requested information about your aircraft. And that's what I need.

(Doc. 41-4 at 31 (119:4-8)).

### E. Leading up to Air Bear, Inc. Purchases the BOA Challenger 300

Air Bear did not have a contract or other express agreement with Bowman relating to

10

Bowman facilitating Air Bear's purchase of the BOA Challenger 300. (Doc. 41-4 at 44 (172:21-23)). Daniel testifies that, at some point, Hodge asked him how Bowman was being paid for his work related to the BOA Challenger 300 sale/purchase, so Daniel asked Bowman. (Doc. 41-3 at 74-75 (292:1-293:13)). Daniel testifies that Bowman responded: "they were going to do a "back-to-back." (*Id.*). Hodge also testifies that he asked Daniel how Bowman was being paid and that Daniel told him it was a back-to-back. (Doc. 41-5 at 4 (11:4-17)). (A "back-to-back" is where the broker purchases the aircraft and sells it to the purchaser, generally for a profit. *See* doc. 41-4 at 43 (165:21-23)). In fact, at Hodge's direction, Daniel told BALCAP, specifically Dyer, that Air Bear was not represented by Bowman. (Doc. 41-3 at 103 (407:19-22); doc. 14-3 at 104 (411:23-412:17)). Bowman disputes this, testifying that he did not intend to do a back-to-back transaction with the BOA Challenger 300. (Doc. 41-4 at 43 (165:17-166:7).

Additionally, in an effort to get Air Bear to hire him to be the broker for the sale of its Lear 45 jet, Bowman presented a proposed brokerage contract for the sale of the Lear 45, which included a 2.5 percent commission. (Doc. 41-3 at 75 (293:19-295:16); doc. 41-3 at 269-270)). Although the contract came from Bowman, it proposed ATC Jets, LLC as the agent for Air Bear. (*Id.*). Daniel gave a printed copy of the contract to Hodge, but the contract was never signed and the agreement was never consummated. (*Id.*). Instead, the Lear 45 was ultimately sold with Shawn Dining of Dallas Jet International acting as Air Bear's broker. (Doc. 41-3 at 30 (114:18-22); doc. 41-3 at 196-197). Dining was contacted directly about representing Air Bear in the sale of the Lear 45. (*Id.*). He sent Air Bear a listing agreement and an invoice for a retainer. (Doc. 41-3 at 191-192). Air Bear paid Dallas Jet International a $99,000.00 commission for finding a buyer for the Lear 45. (Doc. 41-3 at 30 (114:18-22); doc. 41-3 at 196-197). Although Daniel would relay communications between Hodge and Shawn Dining, he had nothing to do with the sale of the

11

aircraft because, as Chief Pilot, it was not Daniel's job to make decisions for the purchase or sale of an aircraft. (Doc. 41-3 at 9 (29:1-30:19, 32:7-12)).

Richardson (LEAS broker) testifies that Bowman told him he was going to be paid by purchasing both BALCAP's aircraft and Air Bear's Lear 45 at wholesale price and sell them at retail price. (Doc. 41-2 at 9 (32:4-22)). Bowman even proposed a § 1031 like-kind exchange where Air Bear would trade in the Lear 45 to Ray Henderson of ATC Jets and purchase another plane on trade. (Doc. 41-4 at 34 (132:14-133:8); doc. 41-4 at 109). Bowman had an undocumented agreement with Henderson that if Henderson sold the aircraft, he'd split the commission with Bowman. (Doc. 41-4 at 35 (136:17-23)). Richardson testifies he believes Henderson and Bowman were working "in cahoots." (Doc. 41-2 at 6 (19:15-18)).

Hodge testifies that he expected Bowman was going to be paid by the seller of the BOA Challenger 300, perhaps splitting a portion of the seller's commission. (Doc. 41-5 at 20 (74:10-23)). Hodge further testifies that, consistent with what Bowman told Richardson, he thought Bowman was trying to "flip" the BOA Challenger 300 and make "huge profits on it." (*Id.* (75:5-9)).

On April 20, 2015, *after* Hodge and Dyer had reached an agreement to sell the BOA Challenger 300 for $ 10 million, Bowman emailed Daniel and told him "they dropped the asking price from 10,750 to 10,495. I am not sure how much room they have there. . . ." (Doc. 41-3 at 300).

The next day, on April 21, 2015, Daniel emailed Bowman as follows:

Hey.

I'm in the air now. But, Jerry and Matt struck a deal directly on Friday. I know you will be upset. But unfortunately this is out of my control. I have [to] kept my bosses [sic] priorities and needs first when it comes to our flight department. I'm very sorry for the way this played out for sure. I will be in touch later today.

12

> Thanks.

(Doc. 41-3 at 300).

On April 27, 2015, Bowman emailed Daniel, Hodge, and others as follows:

> Between December 2, 2014 and April 10, 2015 numerous conversations took place by telephone and e-mail between Randy Bowman with Skyland Aviation Inc. and Bryan Daniel, Chief Pilot for Hodge Management about aircraft Canadair Challenger 300 serial number 121. This aircraft was introduced to Bryan Daniel and Hodge Management by Randy Bowman with Skyland Aviation Inc. by sending information on the aircraft at Bryan Daniel [sic] request. Had this Challenger 300-121 N104FT not been introduced by Randy Bowman of Skyland Aviation they would not have known of the Challenger 300-121. During discussions of Canadair 300-121 with Bryan Daniel of Hodge Management commissions were mentioned at 2.5 per cent. Skyland Aviation Inc. is the procuring cause of the Challenger 300-121 aircraft purchase directly between Hodge Management and Bank of America. I am entitled to a commission of 2.5 percent of the selling price.

(Doc. 41-4 at 114). Bowman testifies that neither Hodge nor Daniel agreed to pay him a 2.5 percent commission for the purpose or sale of any aircraft. (Doc. 41-4 at 28 (106:21-107:2)).

Approximately one month later, on or about May 26, 2015, Air Bear purchased the BOA Challenger 300 for $ 10 million. (Doc. 41-3 at 150-183). Bowman has received no compensation from Air Bear or Hodge for his services in facilitating Air Bear's purchase of the BOA Challenger 300. (Doc. 41-5 at 4 (9:6-17)).

### III. Analysis

In response to Defendants' motion for summary judgment on all claims, Bowman only opposes summary judgment as to Count 1, his quantum meruit/implied contract claim – the claim on which he is moving for partial summary judgment. (Doc. 47 at 1, 20; doc. 42). Additionally, the response to Defendants' motion for summary judgment, as well as Bowman's motion for partial summary judgment and reply, is made by Bowman alone, not Skyland, and there is no

opposition to Defendants' assertion that Skyland is not a proper party to this action.[3] (Doc. 40 at 14, 16; docs. 47 & 50). Accordingly, as all other claims have been abandoned, the only claim for the court to consider is Bowman's quantum meruit/implied contract claim against Hodge and Air Bear, for which there are cross-motions for summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

### A. Quantum Meruit/Implied Contract

Recovery on a theory of quantum meruit arises when a contract is implied. *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (citing *Brannan & Guy, P.C. v. City of Montgomery*, 828 So.2d 914 (Ala.2002)). As the Alabama Supreme court has explained:

> There are two kinds of implied contracts—those implied in fact and those implied in law. Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment, etc.

*Id.* (quoting G*reen v. Hosp. Bldg. Auth. of Bessemer*, 294 Ala. 467, 470, 318 So.2d 701, 704 (1975)). Specifically, "where one knowingly accepts services rendered by another, and the benefit and the result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered." *Id.* (quoting *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So.2d 792, 795 (Ala.1978)). To recover on a quantum meruit claim, a plaintiff must show that he had a reasonable expectation of compensation for his services. *Id.* (citing *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345

---

[3] Bowman testified he does not know why Skyland Aviation is a plaintiff in this lawsuit, that Skyland Aviation was not the broker for the subject transaction, and that Skyland Aviation has not been damaged or wronged in anyway. (Doc. 41-4 at 13 (47:17-48:20)).

(Ala.1991)).

### 1. Bowman's Motion for Summary Judgment

Bowman argues he is entitled to summary judgment regarding Air Bear's liability on his quantum meruit/implied contract claim because: (1) he had no contract with any defendant regarding his services at issue; (2) he performed services to facilitate Air Bear's purchase of the BOA Challenger 300; (3) Air Bear, through its principal – Hodge, and its agent – Daniel, knowingly accepted Bowman's services, and (4) Bowman reasonably expected compensation for its services to be paid. (Doc. 42 at 18-19).

The undisputed facts establish there was no express agreement regarding Bowman's payment for any services related to Air Bear's purchase of the BOA Challenger 300, (*see* doc. 48 at 3); Air Bear first learned about the BOA Challenger 300 when Bowman sent the listing for the aircraft to Daniel, Bowman obtained requested information about the BOA Challenger 300 for Daniel and played a role in setting up demonstration flights; and that Hodge knew that Daniel was interacting with Bowman regarding the BOA Challenger 300. The question for closer examination is whether Bowman's asserted expectation of payment from Air Bear is reasonable.

As to this question, Bowman argues Air Bear and Hodge knew he expected payment for his services because they knew he was a broker. (*See* doc. 42 at 28-31). Bowman relies on the proposition that "a plaintiff broker may establish a 'reasonable expectation of compensation' where the defendant accepts the plaintiff's services knowing the plaintiff was a broker." *In re Performance Insulation, Inc.*, No. 07-11429, 2008 WL 4368673, at *2 (Bankr. S.D. Ala. Sept. 22, 2008). Admittedly, none of the cases Bowman cites stand for the proposition that accepting services from a broker *automatically* establishes a "reasonable expectation of compensation." (*See* doc. 50 at 12 & doc. 42 at 28 citing *Frank Crain Auctioneers, Inc. v. Delchamps*, 797 So. 2d 470,

474 (Ala. Civ. App. 2000) and *In re Performance Insulation, Inc.*, 2008 WL 4368673, at *2). To the contrary, the operative language in this excerpt is *may* – that there is a possibility of a reasonable expectation of payment. "[W]ould a reasonable person, under these circumstances, know that a broker expected to be paid?" *In Performance Insulation, Inc.*, 2008 WL 4368673, at *2. Thus, the other facts must be examined.

There is substantial evidence that Bowman expected to be paid by some means other than a commission, precluding summary judgment in Bowman's favor. There is evidence Bowman expected to be compensated by engaging in a possible back-to-back transaction ("flipping" the aircraft) or by getting an "in" with Air Bear and later acting as its seller's broker for the sale of Air Bear's Lear 45. Additionally, on April 21, 2015, *after* Hodge and Dyer reached an agreement for Air Bear to purchase the BOA Challenger 300 for $ 10 million, Bowman emailed Daniel and told him "they dropped the asking price from 10,750 to 10,495. I am not sure how much room they have there." (Doc. 41-3 at 300). A jury could view this as Bowman relaying a higher bottom line price to Daniel (and Air Bear) to produce a substantial profit for himself without an agreement to do so, since the price Bowman stated was higher than the price Hodge had already negotiated.

Accordingly, summary judgment in favor of Bowman on the quantum meruit/implied contract claim is precluded.

### 2. Defendants' Motion for Summary Judgment

Defendants argue they are entitled to summary judgment because there are contradictory statements that prevent recovery under a quantum meruit theory. (Doc. 49 at 2-6). As noted above, "recovery on the theory of quantum meruit arises when a contract is implied." *Brannan & Guy, P.C.*, 828 So.2d at 920. As Defendants point out, "[t]he difference between an express and implied contract is merely in the mode of proof, the elements being the same, and where mutual agreement

16

is contracted by the statements of either party at the time, there being no expressed agreement, there can be no implication of contractual undertaking by the party." *Broyles v. Brown Eng'g Co.*, 151 So. 2d 767, 770 (Ala. 1963). "It is well-settled that the law will not imply a promise against the express declarations of the party to be charged, made at the time of the supposed undertaking." *Am. Mut. Liability Ins. Co. v. McDiarmid*, 99 So. 849, 850-51 (Ala. 1924) (citing *Meaher v. Pomeroy*, 49 Ala. 146, 1873 WL 773 (Ala. 1873); *Hodges v. Sublett*, 8 So. 800 (Ala. 1891); 5 Corp. Jur. 1385, § 14).

The key purportedly conflicting statements the defendants point to are disputed for purposes of summary judgment. Most importantly, Bowman disputes Daniel's deposition testimony, wherein Daniel states that Bowman told him he (Bowman) was going to be paid through facilitating back-to-back transactions. (*Compare* doc. 41-3 at 74 (292:1-14) (Daniel's depo.) *with* doc. 41-4 at 42 (165:17-166:3) (Bowman's depo.)). Furthermore, neither Bowman nor the defendants' statements to third-parties conclusively establish whether there was or was not an agreement between Bowman and Air Bear/Hodge. Instead, these statements, such as Bowman's deposition testimony wherein he stated he told BALCAP he was <u>not</u> Air Bear's broker (doc. 41-4 at 31 (118:16-23)), Bowman's deposition testimony stating that he had a side deal to split any profits on the sale of Air Bear's Lear 45 with Henderson, (doc. 41-4 at 35 (136:6-21)), and Richardson's testimony that Bowman told him about how he (Bowman) would be paid by "flipping" the aircraft, (doc. 41-2 at 9 (32:4-22)), are evidence for a jury to consider and to determine whether Bowman had a reasonable expectation of compensation from Air Bear/Hodge for his services. *See Utah Foam Prods., Inc.*, 584 So.2d 1345. Bowman points to other evidence, including the fact Air Bear/Hodge accepted his services knowing he was a broker and knowing "brokers" were typically paid in similar circumstances. Accordingly, because there are questions

of fact, the defendants' motion for summary judgment as to Bowman's quantum meruit/implied contract claim is due to be denied.

## IV. Conclusion

Based on the foregoing, there is a question of fact as to the reasonableness of Bowman's expectation of payment from Air Bear and Hodge. Accordingly, Bowman's motion for summary judgment (doc 42) is **DENIED**. Defendants' motion for summary judgment (doc. 39) is **GRANTED IN PART AND DENIED IN PART** as outlined above. The only remaining claim is Bowman's quantum meruit/implied contract claim against Hodge and Air Bear.

The parties are encouraged to discuss alternative dispute resolution, including the potential for mediation facilitated by a United States Magistrate Judge. The parties are **ORDERED** to file a joint status report by **May 31, 2018**, regarding the status of such discussion and whether they believe such mediation would be beneficial to the resolution of the remaining claim.

DONE this 17th day of May, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE